IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-86

No. 288A21

Filed 15 July 2022

IN THE MATTER OF: J.C.J. and J.R.J.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 22 October 2020 and 20 May 2021 by Judge Regina R. Parker in District Court, Beaufort County. This matter was calendared for oral argument in the Supreme Court on 1 July 2022, but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*J. Edward Yeager, Jr., for petitioner-appellee Beaufort County Department of Social Services.*

*Peter Wood for respondent-appellant father.*

*Benjamin J. Kull for respondent-appellant mother.*

*Matthew D. Wunsche, GAL Appellate Counsel, for North Carolina Guardian Ad Litem Program, amicus curiae.*

ERVIN, Justice.

¶ 1     Respondent-mother Courtney J. and respondent-father Jeremy J. appeal from orders entered by the trial court terminating their parental rights in their twin sons J.C.J. and J.R.J.[1] After careful consideration of the parents' challenges to the trial

---

[1] J.C.J. and J.R.J. will be referred to throughout the remainder of this opinion as "Jaden" and "Jack," respectively, which are pseudonyms used for ease of reading and to protect the identities of the juveniles.

court's termination orders in light of the record and the applicable law, we conclude that the trial court's termination orders should be affirmed.

¶ 2 Jaden and Jack, who are twins, were born in July 2015 and have five older half-siblings.[2] On 23 October 2017, the Beaufort County Department of Social Services obtained the entry of orders placing the twins in nonsecure custody and filed juvenile petitions alleging that they were neglected juveniles. In these petitions, DSS alleged that the twins resided in an injurious environment and received improper care, supervision, and discipline. DSS further alleged that it had received nineteen child protective service reports relating to the family since March 2013 based upon concerns relating to the adequacy of the supervision and discipline that the older children had received, the adequacy of the medical care that had been provided to these children, parental substance abuse, and the children's exposure to sexual conduct. On 9 September 2017, DSS alleged that it had received a child protective services report describing "child on child sexual abuse occurring in the home" involving two of the twins' half-siblings, with four of the twins' half-siblings having previously been found to be neglected based primarily upon respondent-mother's failure to take advantage of the remedial services that she had been offered. Finally, DSS alleged that the twins' speech development was delayed and that, even though

---

[2] In view of the fact that the parental rights of the twins' half-siblings were not at issue in the termination of parental rights proceeding at issue in this case, we will refrain from discussing the status of the twins' half-siblings in any detail in this opinion.

a social worker had recommended that they receive speech therapy, respondent-mother had refused to ensure that they received such therapy on the grounds that she did not need assistance in "keeping up with the children's appointments and/or raising her children."

¶ 3        After a hearing held on 11 April 2018, Judge Darrell B. Cayton, Jr., entered an order on 12 April 2018 determining that the twins were neglected juveniles. In light of this determination, Judge Cayton ordered respondent-mother to continue to comply with the terms of an Out of Home Family Services Agreement; continue to attend the Families Understanding Nurturing Program; continue to receive therapeutic treatment at Pamlico Counseling; participate in family therapy when recommended by her own and the twins' therapists; attend all available visits with the children; and acquire a valid driver's license and transportation. Similarly, the trial court ordered respondent-father to continue to comply with the terms of his own family services agreement; continue to attend the Families Understanding Nurturing Program; join in couple's therapy with respondent-mother; participate in family therapy with the twins when their therapist deemed it appropriate for him to do so; visit with the children; and acquire a valid driver's license and transportation. The parents were granted at least one hour of supervised visitation with the children each week.

¶ 4 On 5 October 2018, respondent-mother filed a motion in which she requested that a trial home placement be authorized. After conducting a permanency planning hearing on 21 November 2018, Judge Cayton entered an order finding that respondent-mother had completed the Families Understanding Nurturing Program, participated in couple's counseling, and taken advantage of all available opportunities to visit with the children. In addition, Judge Cayton found that respondent-mother had continued to participate in therapeutic treatment at Pamlico Counseling until July 2018 and that, on 14 November 2018, she had resumed participating in therapy with Dream Provider Care Services. On the other hand, Judge Cayton found that respondent-mother remained unemployed and did not wish to seek or obtain employment. Similarly, Judge Cayton found that respondent-father had completed the Families Understanding Nurturing Program, attended couple's counseling, and taken advantage of all available opportunities to visit with the children. Finally, Judge Cayton found that neither parent had obtained a valid driver's license. Based upon these and other findings, Judge Cayton determined that the parents had made sufficient progress to warrant a trial home placement and established a primary permanent plan of reunification, with a concurrent plan of adoption.

¶ 5 Following a permanency planning hearing held on 20 March 2019, the trial court entered an order on 21 March 2019 in which it found that the twins remained

in a trial home placement with the parents and that, while "[t]he present risk of harm to the children in the [parents'] home is low," "the situation is rickety, perhaps prone to sudden collapse." On 2 May 2019, the trial home placement ended.

¶ 6     On 6 April 2020, DSS filed a motion alleging that the parents' parental rights in the twins were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1); willfully leaving the twins in a placement outside the home for more than twelve months without making reasonable progress toward correcting the conditions that had led to their removal from the family home, N.C.G.S. § 7B-1111(a)(2); willfully failing to pay a reasonable portion of the cost of the care that the twins had received following their removal from the family home, N.C.G.S. § 7B-1111(a)(3); and dependency, N.C.G.S. § 7B-1111(a)(6), and that termination of the parents' parental rights would be in the twins' best interests. In its termination motion, DSS alleged that the trial home placement had ended in May 2019 after the parents had failed to deliver the twins to daycare in a timely manner, preventing the twins from receiving remedial services, such as speech and occupational therapy, and causing the twins' developmental progress to end or even regress. In addition, DSS alleged that the twins had been removed from the trial home placement because the parents had failed to provide them with proper supervision, with Jack having sustained burns after touching a "burn barrel" and with the parents having failed to report the injury to DSS or to seek medical treatment for this injury.

After hearings held on 30 September and 2 October 2020, the trial court entered an adjudication order on 22 October 2020 in which it concluded that all four of the grounds for termination alleged in the termination motion existed. After a hearing held on 3 May 2021, the trial court entered a dispositional order on 20 May 2021 determining that it was in the twins' best interests for the parents' parental rights to be terminated and ordering that their parental rights in the twins be terminated. *See* N.C.G.S. § 7B-1110(a) (2021). The parents noted appeals to this Court from the trial court's termination orders.

## I. Standard of Review

"We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.' " *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). Appellate review of the trial court's adjudicatory findings of fact is limited to "those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. 403, 407 (2019). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*,

372 N.C. at 407. "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

¶ 9        "If [the trial court] determines that one or more grounds listed in section 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842 (2016) (first citing *In re Young*, 346 N.C. 244, 247 (1997); and then citing N.C.G.S. § 7B-1110 (2015)). We review the trial court's dispositional findings to determine whether they are supported by sufficient evidence, *In re K.N.L.P.*, 380 N.C. 756, 2022-NCSC-39 ¶ 11, with unchallenged dispositional findings of fact being deemed binding for purposes of appellate review. *In re Z.L.W.*, 372 N.C. 432, 437 (2019). A trial court's dispositional determination "is reviewed solely for abuse of discretion," *In re A.U.D.*, 373 N.C. 3, 6 (2019) (citing *In re D.L.W.*, 368 N.C. at 842), with an abuse of discretion having occurred "where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107 (2015) (quoting *State v. Hennis*, 323 N.C. 279, 285 (1988)). We will now examine the validity of the parents' challenges to the trial court's termination orders utilizing the applicable standard of review.

## II.     Analysis

### A. Adjudication

As an initial matter, the parents argue that the trial court erred by determining that their parental rights in the twins were subject to termination. A single ground for termination is sufficient to support a trial court's decision to terminate a parent's parental rights in a child. *E.g., In re Moore*, 306 N.C. 394, 404 (1982). We will begin our analysis by determining whether the trial court erred by concluding that the parents' parental rights in the twins were subject to termination based upon a failure to pay a reasonable portion of the cost of the care that the twins received after they were placed outside the family home pursuant to N.C.G.S. § 7B-1111(a)(3).

A trial court is authorized to terminate a parent's parental rights in a child pursuant to N.C.G.S. § 7B-1111(a)(3) in the event that

> [t]he juvenile has been placed in the custody of a county department of social services, a licensed child-placing agency, a child-caring institution, or a foster home, and the parent has for a continuous period of six months immediately preceding the filing of the petition or motion willfully failed to pay a reasonable portion of the cost of care for the juvenile although physically and financially able to do so.

N.C.G.S. § 7B-1111(a)(3) (2021). As we have previously explained,

> [t]he cost of care refers to the amount it costs the Department of Social Services to care for the child, namely, foster care. A parent is required to pay that portion of the

> cost of foster care for the child that is fair, just and equitable based upon the parent's ability or means to pay.

*In re J.M.*, 373 N.C. 352, 357 (2020) (cleaned up).

¶ 12    In support of its determination that the parents' parental rights in the twins were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3), the trial court made the following findings of fact:

> 243.    Mother and Father are [able-bodied] adults capable of working.
>
> 244.    Throughout the pendency of this case, neither parent has contributed to the cost of these children's care. But, they have provided the juveniles with gifts.
>
> 245.    Throughout the pendency of the case, Father has been consistently employed at Rose Acre Egg Farm; and, he testified that there is surplus money remaining after expenses are paid.
>
> 246.    Father is able to adjust his income so that he can work more when necessary to make additional income. Father indicated that he is willing to do that to support these juveniles.
>
> 247.    While Mother is physically able to work, she has chosen not to do so.

In addition,  the trial court found that, on 23 April 2020, the Beaufort County Child Support Agency, acting on behalf of North Carolina Foster Care, had filed a complaint against the parents seeking an award of child support, that respondent-mother had been ordered to pay $50 per month in child support and found to owe an arrearage of $1,650 on 14 August 2020, and that respondent-father had been ordered to pay $473

per month in child support and found to owe an arrearage of $17,028 on 25 September 2020. The trial court further found that, even though the parents had the ability to pay child support in the required amounts, they "did not pay child support to offset the juveniles' cost of care" "during the period of time prior to the entry of those child support orders." In addition, the trial court found that, while the parents had been aware as early as 2018 that a referral had been made to the Beaufort County Child Support Agency, neither of them had "attempted to look into the referral" or ascertain the amount of child support that they needed to pay. As a result, the trial court determined that the parents' failure to pay child support was "willful as both parents were aware they had the obligation to support their children, knew that [DSS] had made a referral to the Beaufort County Child Support Agency, and decided to take no step to address the issue until they were sued for failure to pay child support."

¶ 13        According to respondent-mother, the trial court erred in Finding of Fact No. 244 by determining that the parents had contributed nothing toward the cost of the care that the twins had received. In support of this contention, respondent-mother directs our attention to evidence tending to show that the parents had provided gifts, clothing, and diapers for the twins, arguing that these "in-kind contributions were [their] only option" because it was "impossible to pay the government money." We do not find this contention to be persuasive.

¶ 14        In *In re D.C.*, 378 N.C. 556, 2021-NCSC-104, the trial court made unchallenged findings that the parents were physically able to work, had started a lawn care business during the relevant six-month period, and had stated that their lawn care business earned sufficient income to permit them to support themselves and their children. *Id.* ¶ 15. Although the trial court found that the parents had provided to the child who was the subject of the termination proceeding "some food and gifts at visitation" and that they had given the juvenile "some small amount of spending money," *id.*, the trial court also found that the parents did not pay any child support or give DSS or the foster parents any money for use in defraying the cost of the care that the child had received. *Id.* In affirming the trial court's determination that the parents' parental rights in the child was subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3), this Court stated that "[t]he trial court's unchallenged findings of fact demonstrate[d] that respondents had the ability to pay a reasonable portion of [the juvenile]'s cost of care *but failed to pay any amount to DSS or the foster parents toward cost of care.*" *Id.* ¶ 20 (emphasis added).

¶ 15        As was the case in *In re D.C.*, the record contains evidence tending to show that respondent-mother provided gifts, clothing, and diapers for the twins. However, as was also the case in *In re D.C.*, the sporadic provision of gifts for the benefit of the twins by respondent-mother does not preclude a determination that respondent-mother had failed to pay a reasonable portion of the cost of the care that the twins

had received following their removal from the family home given that respondent-mother made no payment to DSS or the foster parents during the pendency of the case, including the determinative six-month period, and given that the "cost of care" for purposes of N.C.G.S. § 7B-1111(a)(3) relates to the financial costs that DSS was required to assume while the twins were in its custody. *In re Montgomery*, 311 N.C. at 113. In view of the fact that the trial court's unchallenged findings of fact show that, even though respondent-mother had the physical ability to work, she elected not do so and the fact that the undisputed record evidence shows that respondent-mother failed to make any monetary payments to DSS or the foster parents for the purpose of assisting in the provision of care for the twins, we hold that respondent-mother's challenge to the sufficiency of the evidentiary support for Finding of Fact No. 244 lacks merit.

¶ 16    Secondly, respondent-mother argues that her failure to pay a reasonable portion of the cost of the care that the twins had received while in DSS custody was not willful because it is "impossible for a parent to pay the government child support" in the absence of a child support order and because DSS "did not formally ask [the parents] for child support until a month ***after*** it had already moved to terminate for nonpayment." We do not find this argument to be persuasive.

¶ 17    In *In re S.E.*, 373 N.C. 360 (2020), this Court recognized that "[t]he absence of a court order, notice, or knowledge of a requirement to pay support is not a defense

to a parent's obligation to pay reasonable costs, because parents have an inherent duty to support their children." *Id.* at 366. In view of the fact that respondent-mother had an inherent duty to support the twins, she is not now entitled to argue that her failure to pay a reasonable portion of the cost of care that her children received while they were outside her home was not willful based upon the absence of an order requiring her to do so. In addition, the trial court's unchallenged findings of fact demonstrate that, even though respondent-mother had been aware as early as 2018 that a referral had been made to the child support enforcement agency relating to her support obligation, she had failed to investigate the referral or to attempt to ascertain the amount of child support that she needed to pay. As a result, the trial court's findings indicate that respondent-mother knew that she had failed to pay anything towards the cost of the care that her children had received despite DSS' contention that she needed to do so. *See id.* at 366–67 (finding that the respondent-mother "was on notice of her failure to pay something towards the cost of care for her children" in light of the fact that the trial court had repeatedly found in each of the permanency planning orders that had been entered in that case that neither of the parents was paying child support).

¶ 18      Finally, respondent-mother argues that allowing the termination of her parental rights in the twins pursuant to N.C.G.S. § 7B-1111(a)(3) in this case constitutes an "unconscionable and unconstitutional termination by ambush." More

specifically, respondent-mother contends that terminating a parent's parental rights in a child for "failing to do the impossible (pay the government money) . . . without any formal notice of an obligation to do so" violates the Fourteenth Amendment to the United States Constitution and Article I, Section 19 of the North Carolina Constitution. Respondent-mother notes that, while N.C.G.S. § 7B-1111(a)(4) precludes the termination of a parent's parental rights in a private termination action in the absence of formal notice that a payment obligation existed, "parents in child welfare cases may have their rights terminated under N.C.G.S. § 7B-1111(a)(3) *absent* such notice." For that reason, respondent-mother urges us to disavow our decision in *In re S.E.* in light of the constitutionally impermissible "disparate treatment" afforded to parents involved in private termination proceedings and parents involved in child welfare cases. However, since respondent-mother did not advance the constitutional argument upon which she now relies before the trial court, we decline to consider it for the first time on appeal. *See State v. Gainey*, 355 N.C. 73, 87 (2002) (reiterating that "[c]onstitutional issues not raised and passed upon at trial will not be considered for the first time on appeal").

¶ 19 In his sole challenge to the trial court's determination that his parental rights in the twins were subject to termination on the basis of a failure to pay a reasonable portion of the cost of the care that the twins had received after their removal from the family home pursuant to N.C.G.S. § 7B-1111(a)(3), respondent-father contends

that the trial court had erred by failing to make specific findings concerning the six-month determinative period leading up to the filing of the termination motion, arguing in reliance upon *In re Faircloth*, 161 N.C. App. 523, 526 (2003), that a trial court's failure to make findings specifically addressing the relevant six-month period constitutes prejudicial error. In *In re Faircloth*, the record reflected that, despite finding that the respondent-mother had been employed "at various times since 1999," the trial court's findings did not specifically address whether she had been employed from 3 February 2000 to 3 August 2000, which constituted the determinative six-month period for purposes of that case, "or whether she was otherwise financially able to pay." *Id.* at 526. In overturning the trial court's termination order, the Court of Appeals concluded that, "[a]bsent such findings or evidence in the record that respondent-mother could pay some amount greater than zero towards the cost of care for children *during that period of time*," the record did not suffice to support the termination of the respondent-mother's parental rights pursuant to N.C.G.S. § 7B-1111(a)(3). *Id.* (emphasis added).

¶ 20    In this case, however, the trial court's unchallenged findings of fact indicate that, "[t]hroughout the pendency of the case, [respondent-father] has been consistently employed at Rose Acre Egg Farm." In other words, unlike the situation at issue in *In re Faircloth*, the undisputed record evidence in this case reflects that respondent-father was continuously employed from the beginning of the case until

the time of the termination hearing, an interval that necessarily included the determinative six-month period. In addition, the trial court's unchallenged findings of fact establish that, even though respondent-father had the ability to make payments to offset a portion of the cost of the care that the children had received after their removal from the family home, he had failed to pay any amount towards their care. As a result, the trial court's findings of fact provide ample support for its conclusion that respondent-father's parental rights in the twins were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3). In light of our decision that the trial court did not err by concluding that both parents' parental rights in the twins were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3), we need not address their challenges to the trial court's determination that their parental rights in the twins were also subject to termination for neglect, N.C.G.S. § 7B-1111(a)(1); failure to make reasonable progress toward correcting the conditions that had led to the twins' removal from the family home, N.C.G.S. § 7B-1111(a)(2); and dependency, N.C.G.S. § 7B-1111(a)(6). *E.g. In re E.H.P.*, 372 N.C. at 395.

**B. Disposition**

The parents both argue that the trial court abused its discretion by concluding that the twins' best interests would be served by the termination of their parental rights in light of the fact that the twins had a strong bond with the parents, that the parents had not missed any opportunity to visit with the children during the forty-

two month history of this case, and that "the current plan of shared parenting and visitation was "working for everyone." As part of this process, the parents challenge some of the trial court's dispositional findings of fact as lacking sufficient evidentiary support[3] and assert that the trial court should have utilized a "least restrictive disposition" standard in making its dispositional decision.

¶ 22    In determining whether the termination of a parents' parental rights is in a child's best interests,

> [t]he court may consider any evidence, including hearsay evidence as defined in N.C.G.S. [§] 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1)    The age of the juvenile.
>
> (2)    The likelihood of adoption of the juvenile.
>
> (3)    Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4)    The bond between the juvenile and the parent.

---

[3] Among the dispositional findings that the parents challenge as lacking in sufficient evidentiary support is Finding of Fact No. 82, which states that "[i]t is in the [twins'] best interests to remain placed in the home of [their foster parents], as the [twins] have bonded to them." Although the trial court labeled this determination as a finding of fact, it is, in reality, a conclusion of law and will be treated as such in our analysis. *See In re J.S.*, 374 N.C. 811, 818 (2020) (stating that "[w]e are obliged to apply the appropriate standard of review to a finding of fact or conclusion of law, regardless of the label which it is given by the trial court.").

> (5)    The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6)    Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2021).

¶ 23    As an initial matter, the parents challenge the sufficiency of the evidentiary support for dispositional Finding of Fact No. 40 which states that, in "the [foster parents' home], the [twins] have a routine, with established services," and that "[t]o move the [twins] now would result in a complete disruption of their lives, which would be needlessly detrimental." A DSS supervisor testified at the termination hearing that, even though Jack had experienced developmental delays, he had made "a lot of progress" while in the foster parents' care and that the twins' "well[-]being, their education, down to fun things," had changed dramatically during that time. According to the DSS supervisor, the foster parents took the twins on trips, taught them to swim and ride a bicycle, potty-trained them, and addressed their medical needs by having one of the twin's tongue-tie clipped and by having tubes placed in both twins' ears. On the other hand, the DSS supervisor testified that, prior to the time that DSS had become involved in their lives, the twins did not receive any services even though Jack "require[d] a lot of time and a lot of appointments[] and consistency" in light of the fact that being "out of routine . . . really throws him off." Among other things, the DSS supervisor testified that Jack needed play therapy,

medication appointments, occupational therapy, and speech therapy and that, while living with the foster parents, Jack did not miss any of his appointments and had received his medication on a daily basis. In the DSS supervisor's opinion, the foster parents had put "a lot of effort in teaching these kids and loving these kids and nurturing these kids" and that the removal of the twins from the foster parents' home "would uproot all of their services that they have been getting for years" and be "absolutely detrimental" to the progress that the twins had made while in the foster parents' care. Based upon this testimony, we hold that dispositional Finding of Fact No. 40 has ample evidentiary support.

¶ 24     In addition, the parents challenge the sufficiency of the evidentiary support for dispositional Finding of Fact No. 47, which states that their "ease of leaving the [parents] indicates that the [twins] do not have a strong bond with the" parents and that the twins "have been out of their home for so long that the [twins] view the [foster parents] as their caretakers." Arguing in reliance upon respondent-mother's testimony that she has an "[a]mazing" bond with the twins, the maternal great-grandfather's testimony that he had "never seen [the bond between respondents and the twins] be weak," and the maternal great-grandmother's testimony that respondents "love [the twins]. They just love them. They're their lives," the parents assert that "[a]ll the evidence pointed to a strong bond." In addition, the parents note

that they never missed an opportunity to visit with the twins, "except for one" instance involving respondent-mother, over a period of forty-two months.

¶ 25        According to well-established North Carolina law, a trial court's findings of fact are binding for purposes of appellate review "where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." *In re Montgomery*, 311 N.C. at 110–11. Although the evidence upon which the parents' rely in challenging to the sufficiency of the record to support dispositional Finding of Fact No. 47 relies certainly appears in the record, a DSS supervisor described the twins' bond with respondents as "attenuated." After acknowledging the parents' consistency in visiting with the twins, the DSS supervisor testified that the twins are not "put off" or crying at the beginning or end of their visits with the parents and that the twins were "fine" about returning to their foster mother at the conclusion of these visits. In addition, the DSS supervisor testified that, since the foster parents had "been [the twins'] caretakers for so long" and since the foster parents' other children referred to them as "mommy" and "daddy," the twins had been "picking up on mommy, daddy roles." In light of this evidence, we hold that the trial court reasonably inferred that the twins lacked a strong bond with the parents and that they viewed their foster parents as their caretakers, *see In re D.L.W.*, 368 N.C. at 843 (stating that it is the trial judge's duty to consider all the evidence, to pass upon the credibility of the witnesses, and to determine the reasonable inferences to be drawn

from the evidence). As a result, dispositional Finding of Fact No. 47 has sufficient record support.

Thirdly, the parents argue that the trial court abused its discretion by terminating their parental rights without utilizing a "least restrictive disposition" test in order to make this determination. As part of this process, the parents assert that the trial court should have ascertained whether "continued contact with the birth family" would have benefitted the twins and that, since the parents and the foster parents "worked together and shared parenting," the trial court should not have "[e]nd[ed] all contact" between the twins and the parents. The parents urge us to "follow the lead of a number of other jurisdictions" by adopting a dispositional standard "that encourages contact between parents and children even when the parents cannot regain custody," citing *Fla. Dep't of Child. & Fams. v. F.L.*, 880 So. 2d 602, 609–10 (2004) (per curiam) (holding that a parent's rights may be terminated pursuant to a specific statutory provision "only if the state proves both a prior involuntary termination of rights to a sibling and a substantial risk of significant harm to the current child" and that "the state must prove that the termination of parental rights is the least restrictive means of protecting the child from harm"); Iowa Code § 232.99(4) (2020) (providing that, "[w]hen the dispositional hearing is concluded the court shall make the least restrictive disposition appropriate considering all the circumstances of the case"); Ark. Code Ann. § 9-27-329(d) (West

2021) (providing that, "[i]n initially considering the disposition alternatives and at any subsequent hearing, the court shall give preference to the least restrictive disposition consistent with the best interests and welfare of the juvenile and the public"); Utah Code Ann. § 80-4-104(6) (West 2021) (providing that, "[b]efore an adjudication of unfitness, government action in relation to a parent and a parent's child may not exceed the least restrictive means or alternatives available to accomplish a compelling state interest"); S.D. Codified Laws § 26-8A-27 (2021) (providing that, "[o]n completion of a final dispositional hearing regarding a child adjudicated to be abused or neglected, the court may enter a final decree of disposition terminating all parental rights of one or both parents of the child if the court finds, by clear and convincing evidence, that the least restrictive alternative available commensurate with the best interests of the child with due regard for the rights of the parents, the public and the state so requires"); N.H. Rev. Stat. Ann. § 169-D:17 (2021) (providing that, "[i]f the court finds the child is in need of services, it shall order the least restrictive and most appropriate disposition considering the facts in the case, the investigation report, and the dispositional recommendations of the parties and counsel"); and Wyo. Stat. Ann. § 14-3-431(j)(iii)(A) (West 2021) (providing that, "[a]t the permanency hearing, the department of family services shall present to the court[, i]f the child is placed in a qualified residential program[,] [i]nformation to show that ongoing assessment of the child's strengths and needs continues to

support the determination that placement in a qualified residential treatment program provides the most effective and appropriate level of care for the child in the least restrictive environment consistent with the short-term and long-term goals of the child and the child's permanency plan").

¶ 27      As an initial matter, we note that the Iowa, Arkansas, and New Hampshire statutes upon which the parents rely relate to the dispositional determination that must be made in the aftermath of an adjudication that a child is abused, neglected, dependent, or in need of services.  *See* Iowa Code § 232.2(6); Ark. Code Ann. § 9-27-303(16), (37); N.H. Rev. Stat. Ann. § 169-D:2(II).  In addition, the Wyoming statute upon which the parents rely addresses the status of juveniles placed in "qualified residential treatment program[s]."  Wyo. Stat. Ann. § 14-3-431(j)(iii)(A).  As a result, none of these statutory provisions have any direct bearing upon the proper resolution of the issue that is before us in this case.

¶ 28      In addition, this Court has previously observed that

> [t]he purpose of termination of parental rights proceedings is to address circumstances where parental care fails to "promote the healthy and orderly physical and emotional well-being of the juvenile," while also recognizing "the necessity for any juvenile to have a permanent plan of care at the earliest possible age." N.C.G.S. § 7B-1100. In North Carolina, the best interests of the child are the paramount consideration in termination of parental rights cases. *See In re Montgomery*, 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984). Thus, when there is a conflict between the interests of the child and the parents, courts should consider actions

> that are within the child's best interests over those of the parents. N.C.G.S. § 7B-1100(3).

*In re F.S.T.Y.*, 374 N.C. 532, 540 (2020). In light of these considerations, we have

> rejected arguments that the trial court commits error at the dispositional stage of a termination of parental rights proceeding by failing to explicitly consider non-termination-related dispositional alternatives, such as awarding custody of or guardianship over the child to the foster family, by reiterating that "the paramount consideration must always be the best interests of the child."

*In re N.K.*, 375 N.C. 805, 820 (2020) (quoting *In re J.J.B.*, 374 N.C. 787, 795 (2020)).

As a result, we hold that there is no basis for the use of a "least restrictive disposition" test in this Court's termination of parental rights jurisprudence.

¶ 29    A careful examination of the record reflects that the trial court considered the factors enunciated in N.C.G.S. § 7B-1110(a) in making its dispositional decision. The trial court found that the twins were five years old at that time; that there was a high likelihood that they would be adopted by their foster parents, who had "expressed a willingness to adopt" the twins; and that, since the twins' concurrent permanent plan was adoption, termination of the parents' parental rights would "work to further the achievement of that plan." The trial court further found that, given the twins' "ease of leaving" the parents at the conclusion of parental visits, the twins did not have a strong bond with the parents and that the twins had been out of the parents' home for such a long period of time that they viewed the foster parents as their caretakers.

On the other hand, the trial court found that the twins' relationship with their foster parents was "of a high quality, evidencing a strong bond," and that Jaden was "very close" to his foster father, with "the two of them [having constructed] things together, such as a Lego table that was built for the boys." Finally, the trial court found that the foster parents had ensured that the twins' needs were met and that the twins had been in DSS custody since 23 October 2017, amounting to a period of approximately forty-two months, at the time of the termination hearing. Based upon these and other findings of fact, the trial court concluded that "it is in the juveniles' best interest for the parental rights of [the parents] to be terminated. In view of the fact that the trial court's dispositional orders reflect proper consideration of the required statutory criteria, we are unable to conclude that the trial court's determination that termination of the parents' parental rights would be in the twins' best interests was manifestly unsupported by reason. As a result, the trial court did not err in concluding that the parents' parental rights in the twins were subject to termination based upon the parents' failure to pay a reasonable portion of the cost of the care that the twins had received following their removal from the family home pursuant to N.C.G.S. § 7B-1111(a)(3) and that the termination of the parents' parental rights would be in the twins' best interests. Thus, we affirm the trial court's termination orders.

AFFIRMED.